UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                          :

EVEREST FOODS INC., PUNCHGINI, INC., A   :
SPICE ROUTE INC., IMPECCABLE            :       **ORDER AND OPINION**
KITCHEN BRONX CORP., JUNOON NYC      :       **GRANTING MOTIONS TO**
LLC, PAISLEY RESTAURANT, LLC,          :       **DISMISS THE COMPLAINT**
PAPRIKA II LLC, PAYAM INC.,             :
SABHARWAL HOSPITALITY GROUP LLC,  :
SURYA HELLS KITCHEN INC., SHARMA &  :       21 Civ. 6316 (AKH)
SINGH RESTAURANT GROUP INC., and    :
SHREE LAXMI RESTAURANT INC.,       :
                                            :

                               Plaintiffs,  :

           -against-                  :

ANDREW M. CUOMO, in his individual      :
capacity, and BILL de BLASIO, in his individual :
capacity,                                 :
                                          :

                           Defendants.  :
-------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiffs Everest Foods Inc., Punchgini, Inc., A Spice Route Inc., Impeccable Kitchen

Bronx Corp., Junoon NYC LLC, Paisley Restaurant, LLC, Paprika II LLC, Payam Inc.,

Sabharwal Hospitality Group LLC, Surya Hells Kitchen Inc., Sharma & Singh Restaurant Group

Inc., and Shree Laxmi Restaurant Inc (collectively "Plaintiffs") bring suit for damages under 42

U.S.C. § 1983 against Defendants former-Governor of the State of New York, Andrew M.

Cuomo ("Defendant Cuomo") and Mayor of New York City Bill de Blasio ("Defendant de

Blasio"), (collectively "Defendants"), in their individual capacities.  Complaint ("Compl.), ECF

No. 1.  Plaintiffs allege that in enforcing executive orders, laws, or regulations aimed at curbing

the COVID-19 pandemic, Defendants violated Plaintiffs': (1)  procedural due process rights

under the Fourteenth Amendment; (2) substantive due process rights under the Fourteenth

Amendment; (3) equal protection rights under the Fourteenth Amendment; (4) property rights

under the Takings Clause of the Fifth Amendment; and (5) rights against the impairment of

contracts under the Contracts Clause, U.S. Const. art. I, § 10.   Defendants moves to dismiss the

complaint against for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  ECF Nos. 39, 49.

For the reasons set forth below, both motions are granted.

## BACKGROUND

The following facts are taken from the Plaintiffs' Complaint, which I must

"accept[] as true" for the purpose of this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs are operators of food businesses in New York City that closed permanently, or suffered

loss of business, as a result of executive orders and emergency executive orders issued by

Defendants.  Compl. ¶¶ 3–17, 23, 26.

On March 7, 2020, Governor Cuomo began issuing a series of executive orders

("EOs") "that declared a state of emergency based on COVID-19 in the State of New York [and]

that regulated social and business activities of its residents."  *Id.* ¶ 22.  EO 202.1, issued on

March 12, 2020, "set[] a 50% capacity limit on places of business that had fewer than 500 people

in attendance, but exempted schools, hospitals, nursing homes, mass transit, government and law

enforcement facilities, and 'retail establishments including grocery stores.'"  *Id.* ¶ 24.

Taking his cue from Defendant Cuomo's EOs, NYC Mayor de Blasio also issued

a series of Emergency Executive Orders ("EEOs"), which largely mirrored and enforced

Defendant Cuomo's EOs, beginning with EEO 98 on March 12, 2020, which declared a state of

emergency in New York City.  *Id.* ¶ 26.  EEO 99, dated March 15, 2020 and in accordance with

EO 202.1, limited restaurants to 50 percent capacity but exempted mass transit and grocery

stores.  *Id.* ¶ 28.

On March 16, 2020, Defendant Cuomo issued EO 202.3, which provided that "Any restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption." *Id.* ¶ 29.  In turn, Defendant de Blasio issued EEO 100, directing "all establishments – including restaurants, bars, cafes – that offer food or drink" to close until further notice but allowed them to remain open for take-out or delivery so long as customers waiting for take-out did not exceed the 50 percent capacities. *Id.* ¶ 31.

On March 18, 2020, Defendant Cuomo issued EO 202.6, limiting non-essential businesses to a 50 percent in-person workforce but exempted "[a]ny essential business or entity providing essential services or functions." *Id.* ¶ 32.  In turn, Defendant de Blasio issued EEO 103, directing all businesses that did not qualify as "essential" under EO 202.6 to reduce their in-person workforces by 100 percent. *Id.* ¶ 34.

Defendant Cuomo also directed the Empire State Development Corporation ("ESDC") to issue guidance "as to which businesses are determined to be essential." *Id.*  EOs 202.7 and 202.8, issued on March 19 and March 20, 2020, respectively, reduced in-person workforces by 75 percent and then by 100 percent, again exempting "essential" businesses. *Id.* ¶ 33.  The guidance issued by the ESDC on March 20, 2020 deemed essential "food banks, farmer's markets, convenience stores, grocery 'and beverage' stores, and parks," and thus, "allowed [them] to continue operating." *Id.* ¶ 56.

On March 29, 2020, EO 202.13 extended the shutdowns of indoor dining to April 15, 2020, as well as "clarif[ied] . . . that only **certain** construction is considered exempt" and directed the ESDC to determine which construction sites could remain open, without explaining why "certain" sites would be safe. *Id.* ¶ 35.  EOs 202.14, 202.18, and 202.31, issued on April 7,

2020, April 16, 2020, and May 14, 2020, extended the shutdowns of indoor dining. *Id.* ¶¶ 36, 37, 39. EO 202.31, however, allowed other non-essential businesses in construction, agriculture, forestry, fishing and hunting, and curbside or in-store pickup or drop off for retail, manufacturing, and wholesale trade to reopen without explanation as to why such businesses were presumed safe. *Id.* ¶ 39. As to Defendant de Blasio, throughout April, he continued to issue EEOs "to ensure that the Governor's orders [were] enforced" and incorporating Defendant Cuomo's EO 203 and subsequent orders. *Id.* ¶ 38.

Further, while the ESDC's March 20, March 25, and April 8, 2020 Guidances allowed businesses to request designation as essential, these Guidances specifically provided that restaurants were "not eligible for designation as an essential business," and an April 10, 2020 Guidance referred to "[a]ny dine-in or on-premise restaurant or bar service, excluding take-out or deliver for off-premise consumption as a non-essential business." *Id.* ¶¶ 57–58.

On June 4, 2020, Defendant Cuomo "thanked protestors who had taken to the streets of New York City in closely packed crowds" to protest police misconduct against Black people, even though restaurants remained closed, a seeming inconsistency. *Id.* ¶ 44. Defendant de Blasio also did not enforce social distancing requirements on protesters but did enforce restrictions on indoor dining. *Id.* ¶ 45.

On June 13, 2020, EO 202.41 removed restrictions on certain industries, including the restaurant and food services industry, in eligible regions, which did not include Plaintiffs' businesses; instead, EO 202.45, dated June 26, 2020, extended the shutdowns of indoor dining restrictions applicable to Plaintiffs. *Id.* ¶¶ 40–41. Further, EO 202.48, dated July 6, 2020, specifically exempted indoor food service and dining from the removal of restrictions in EO 202.41. *Id.* ¶ 43.

For his part, Defendant de Blasio issued EEOs 127 and 128 on June 22 and 27, 2020 "in order to ensure that the Governor's orders [were] enforced" and allowed restaurants to open in streets, under the "Open Restaurants Program," if they had ability to comply with city and state regulations and zoning laws regarding outdoor dining. *Id.* ¶ 42. Plaintiffs did not have access to sidewalks or streets where they could build extensions and so could not apply to operate under the Program. *Id.*

During the summer and fall of 2020, Defendant Cuomo issued EOs that allowed the opening of other businesses "where customers enter an indoor space in large groups, share space and air, and touch common surfaces," including construction, museums, art galleries, movie theaters, casinos, bowling alleys, and gyms, subject to adherence to Department of Health guidance and certain capacity limits. *Id.* ¶ 48. Defendant Cuomo failed to explain how construction, museums, art galleries, movie theaters, casinos, bowling alleys, and gyms are different from restaurants, in light of the fact that Plaintiffs took clear and strong measures to sanitize their premises and offer personal protective equipment to staff and customers, in order to prevent the spread of COVID-19. *Id.* ¶¶ 49–50. For his part, Defendant de Blasio called indoor dining "a very optional activity, which some people do a lot who have the resources and others can't do at all because they don't have the resources." *Id.* ¶ 74.

On October 6, 2020, Defendant Cuomo issued EO 202.68, which established red, orange, and yellow zones with different "mitigation measures" to be established by the Department of Health in each, based on "cluster-based cases of COVID-19." *Id.* ¶ 59. In red zones, restaurants were limited to take-out or delivery; in orange zones, they could seat four or fewer outdoors; and, in yellow zones, they could seat groups of four or fewer indoors. *Id.*

Defendant Cuomo allowed restaurants to reopen on September 30, 2020, under EO 202.61, at 25 percent indoor capacity with no bar service, and in EO 202.74, dated November 12, 2020, ordered restaurants to cease in-person dining between 10:00 p.m. and 5:00 a.m., a restriction only additionally placed on gyms. *Id.* ¶ 62. Defendant de Blasio continued to enforce Defendant Cuomo's EOs. *Id.* 63.

On December 11, 2020, Defendant Cuomo announced that the determination of which zone a geographic area would be in was based upon positivity rates and hospital capacity, and specifically suspended indoor dining in New York City, noting the federal Center for Disease Control's updated guidance, which identified "[i]ndoor venues, where distancing is not maintained and consistent use of face masks is not possible (e.g. restaurant dining) . . . as particularly high-risk scenarios." *Id.* ¶ 61.

Finally, "[o]n April 19, 2021, Defendant Cuomo allowed restaurants to operate at 50 percent indoor capacity; outside New York city, he allowed 75-percent indoor capacity on March 19, 2021." *Id.* ¶ 66.

While the EOs allowed restaurants to "serve food or beverage for off-premises consumption," *id.* ¶ 29, as well as to offer "take-out and delivery," *id.* ¶ 47, Plaintiffs allege that Defendants, through their EOs and EEOs, "unfairly and arbitrarily closed restaurants and directed . . . [the] designat[ion of] essential and non-essential business[,] . . . [which] effectively closed and destroyed New York City restaurants, including Plaintiffs' businesses." *Id.* ¶ 87.

Plaintiffs brought this suit for damages against both Defendants, acting in their individual capacity, alleging violations of their constitutional rights, including their: (i) procedural and substantive due process and equal protection of the laws under the Fourteenth

Amendment (Counts I–III); (ii) property rights under the Takings Clause of the Fifth

Amendment (Count IV); and (iii) contractual rights under the Contracts Clause, Article I, Section

10 (Count V).  Defendants move to dismiss the complaint on all counts, arguing that they did not

violate any of the aforementioned rights, or in the alternative, that they are entitled to qualified

immunity because none of these rights was clearly established at the time.

## DISCUSSION

I.     Legal Standard

   To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs must allege "sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556

U.S. at 678.  A claim is facially plausible when it pleads "factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

short of the line between possibility and plausibility of entitlement to relief." *Id.*

   When considering a motion to dismiss under Rule 12, the Court must "accept[] all

factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor." *Nielsen v.

Rabin*, 746 F.3d 122, 130 (2d Cir. 2014).  However, the Court "must disregard legal conclusions,

which are not entitled to the presumption of truth. *See Heidel v. Hochul*, No. 20-CV-10462,

2021 U.S. Dist. LEXIS 203572, at *12 (S.D.N.Y. Oct. 21, 2021) (citing *Iqbal*, 550 U.S. at 570);

*see also Ruston v. Town Bd. For Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) ("Under

*Iqbal*, factual allegations must be sufficient to support necessary legal conclusions.  "Dismissal is

appropriate when 'it is clear from the face of the complaint, and matters of which the court may

take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Parkcentral*

*Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

II. Analysis

Defendants move to dismiss all claims based upon Plaintiffs' failure to plausibly allege violations of their constitutional rights, or in the alternative, on qualified immunity grounds.

"In an official capacity suit, the real party in interest is the governmental entity and not the named official.  By contrast, individual capacity suits seek to impose individual liability upon a government officer for her actions under color of law." *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (cleaned up).  "The identity of the real party in interest dictates what immunities may be available." *Lewis v. Clarke*, 137 S. Ct. 1285, 1292 (2017).  Whereas "Defendants in an official-capacity action may assert sovereign immunity," including Eleventh Amendment immunity, if they are state officials, "[a]n officer in an individual-capacity action . . . may be able to assert personal immunity defenses . . . .  But sovereign immunity does not erect a barrier against suits to impose individual and personal liability." *Id.* (cleaned up).

Although Defendants were clearly acting in their official capacities when they issued the relevant EOs and EEOs, because Plaintiffs bring individual capacity suits for compensatory and punitive damages, Defendants may not rely on the Eleventh Amendment or the doctrine of municipal liability to avoid liability. *See Avery v. DiFiore*, No. 18-CV-9150, 2019 U.S. Dist. LEXIS 131966, at *6-7 (S.D.N.Y. Aug. 6, 2019) (noting that the plaintiff purported to sue the defendants in their individual capacities and sought punitive damages, which are not ordinarily available against the state).  Accordingly, I consider whether Defendants are entitled to dismissal on qualified immunity grounds.

"The doctrine of qualified immunity shields government employees from civil liability where performance of their discretionary functions 'does not violate clearly establish statutory or constitutional rights of which a reasonable person should have known.'" *In re New York City Policing During Summer 2020 Demonstrations*, Nos. 20-CV-8924 et al., 2021 U.S. Dist. LEXIS 128437 (S.D.N.Y. July 9, 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because qualified immunity is an immunity from suit rather than a mere defense to liability, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation[,]" including on a Rule 12(b)(6) motion. *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)); *accord. Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020); *see also McCue v. City of New York (In re World Trade Ctr. Disaster Site, Litig.)*, 521 F.3d 169, 177 (2d Cir. 2008) (affirming judgment on the pleadings, denying qualified immunity based upon state-law defenses).

In ruling on a motion to dismiss based upon qualified immunity, courts face two questions: (1) whether a plaintiff's constitutional rights were violated, and (2) whether, at the time of the violation, the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court has instructed that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). I hold that Plaintiffs have failed to plausibly allege the violation of any constitutional right.

A. Violation of Constitutional Rights

Since the start of the COVID-19 pandemic, many courts have cited the Supreme

Court's 1905 decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), when considering

challenges to state and local actions aimed at curbing the COVID-19 pandemic.  *See Hopkins*

*Hawley LLC v. Cuomo*, 518 F. Supp. 3d 705, 710 (S.D.N.Y. 2021).  In *Jacobsen*, the Supreme

Court upheld a mandatory vaccination law against a substantive due process challenge in the

wake of a public health crisis, holding that in times of public health crises, a state or local law

"enacted for the public health" would only be struck down if it had "no real or substantial

relation [to the public health] or is, beyond all question, a plain, palpable invasion of rights

secured by the fundamental law."  *See Jacobsen*, 197 U.S. at 25, 31.  Over a century later, Chief

Justice Roberts built on *Jacobsen*'s deferential framework in *South Bay United Pentecostal*

*Church v. Newsom*, 140 S. Ct. 1613 (2020), and in a concurring opinion, wrote:

> The precise question of when restrictions on particular social activities should be lifted
> during the pandemic is a dynamic and fact-intensive matter subject to reasonable
> disagreement. Our Constitution principally entrusts the safety and the health of the people
> to the politically accountable officials of the States to guard and protect.

*Id.* at 1613 (cleaned up).  However, recent decisions from the Supreme Court and Second Circuit

have placed *Jacobsen*'s deferential framework in question.

In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court granted

temporary injunctive relief to New York-based religious entities against Governor Cuomo's

strict capacity limits on in-person services.  141 S. Ct. 63 (2020).  The Court did not mention, let

alone apply, *Jacobsen*'s deferential standard and instead applied current doctrine governing First

Amendment Free Exercise claims.  On remand, the Second Circuit stated that *Jacobsen* and

*South Bay* were no longer the correct legal framework for examining free exercise of religion

challenges to COVID-19 restrictions.  *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 635–36 (2d

Cir. 2020).

After *Roman Catholic Diocese*, courts have disagreed as to the scope of its holding, with some concluding that *Jacobsen* is no longer relevant to *any* constitutional claims arising from the pandemic, and others concluding that the limitation on *Jacobsen* may be cabined to the Free Exercise context in which it arose.  *Compare Big Tyme Investments, L.L.C. v. Edwards*, 985 F.3d 456 (5th Cir. 2021) (Willet, J., concurring) (arguing *Jacobsen* has been displaced), *with Plaza Motors of Brooklyn, Inc. v. Cuomo*, No. 20-CV-4851, 2021 U.S. Dist. LEXIS 12726, at *5 (E.D.N.Y. Jan. 22, 2021) (concluding that *Jacobsen* was abrogated), *and Hopkins Hawley LLC*, 518 F. Supp. 3d at 710 (concluding that *Jacobsen* still applies to other constitutional claims); *see also Delaney v. Baker*, No. 20-CV-11154, 2021 U.S. Dist. LEXIS 1567, at *12 (D. Mass. Jan. 6, 2021) (applying both *Jacobsen* and a traditional constitutional analysis).

Here, Plaintiffs do not assert any claims clearly governed by *Roman Catholic Diocese*; however, I need not linger on the question of which standard applies to Plaintiffs' claims because they fail no matter whether *Jacobsen* or traditional constitutional analysis applies.  I address each in turn.

1. *Jacobsen*

Plaintiffs cannot meet the *Jacobsen* standard because they cannot show that the EOs and EEOs at issue bear "no real or substantial relation [to the public health] or [are], beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *See Jacobsen*, 197 U.S. at 25, 31.  The restrictions on indoor-dining clearly relate to the public welfare by aiming to curb the transmission of COVID-19 in higher risk settings, such as restaurants.  *See, e.g.*, *Hawley Hopkin LLC*, 518 F. Supp. 3d at 714; *Columbus Ale House, Inc. v. Cuomo*, 495 F. Supp. 3d 88, 93 (E.D.N.Y. 2020).  Moreover, the distinction between essential and non-essential

businesses, and distinctions among various types of non-essential businesses, cannot be said to be without reason.  *See Luke's Catering Serv., LLC v. Cuomo*, 485 F. Supp. 3d 369, 382 (W.D.N.Y. 2020).  Indoor dining involves unique circumstances likely to facilitate COVID-19 transmission.  Patrons must remove their masks to eat, increasingly the likelihood of transmission between individuals.  Restaurants also bring together individuals from different households, facilitating communal spread.  Treating restaurants differently—and indoor dining specifically—logically follows.

Plaintiffs likewise have not plausibly alleged that the EOs and EEOs are "beyond all question, a plain, palpable invasion of rights secured by fundamental law."  *Jacobsen*, 197 U.S. at 31.  In their opposition, Plaintiffs cite no authority—binding, persuasive, or otherwise— where a court considering similar restrictions has so held.  Plaintiffs clearly recognize that COVID-19 posed, and continues to pose, a significant threat to public health.  For example, Plaintiffs allege that they "took clear and strong measures to sanitize their premises," including offering PPE "to both staff and customers, in order to prevent the spread."  Compl. ¶ 50.  In essence, they concede that at least some restrictions or regulations were warranted or justified, suggesting that a line reasonably might be drawn on the basis of safety measures having less impact on the economic viability of restaurants.  However, no such line existed at the time of the conduct complained of, and may not practically drawn in some judicial decision.  Clearly, it is not "beyond all question" that the actions Defendants chose to take constituted "a plain, palpable invasion of rights secured by fundamental law."  *See Hopkins Hawley LLC*, 518 F. Supp. 3d at 714 (concluding that claims were unlikely to succeed under *Jacobsen* because Plaintiffs sought relaxation of the Dining Policy at issue and implicitly conceded that public health regulation of restaurants in a pandemic is constitutional).

Plaintiffs' claims plainly fail under *Jacobsen*, and Defendants would be entitled to dismissal under this standard.  The same is the case under traditional constitutional analysis.

2. Traditional Constitutional Analysis

a. Fourteenth Amendment Procedural Due Process

Plaintiffs claim that they were deprived of their Fourteenth Amendment procedural due process right to have notice and a hearing before their livelihood was taken away by regulatory or executive action.  Compl. ¶ 79.

The Fourteenth Amendment requires notice and an opportunity to be heard before individuals may be deprived of property rights.  Although the Supreme Court has recognized a property interest in one's livelihood, *see Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972), the procedural due process rights are triggered only by adjudicative—rather than legislative—actions.  Adjudicative actions are "designed to adjudicate disputes facts in particular cases."  *O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413, 429 (S.D.N.Y. 2004).  In contrast, legislative actions have "general application and look to the future;" they carry no due process protections.  *Id.*  I hold that Plaintiffs do not plausibly allege a deprivation of their procedural due process rights because Defendants' EOs and EEOs were plainly legislative.

Plaintiffs argue that the EOs and EEOs were adjudicative because of their "arbitrary nature" and the way they "affected certain industries but not others, within their designation between essential and non-essential businesses."  Opposition to Motion to Dismiss by Defendant Cuomo ("Opp."), at 2–3, ECF No. 47 (describing the interest as the right to work "at all").[1]  Plaintiffs do not offer any explanation in their opposition, nor allegations in the

---

[1] Although Defendants separately moved to dismiss the Complaint against each of them, and Plaintiff opposed each of those motions, *see* ECF Nos. 47, 57, Plaintiff makes identical arguments in both.  I therefore cite to relevant pages in Plaintiffs' Opposition to Defendant Cuomo's motion.

Complaint, suggesting that the EOs or EEOs were not generally applicable to all restaurants or wholly prospective.  Plaintiffs do not allege that they were the subject of individual enforcement actions or that they were singled out for especial treatment.  Rather, the gravamen of their Complaint is that restaurants were singled out for disfavorable treatment among businesses with indoor operations.  In sum, the Complaint clearly alleges that Defendants' orders were legislative in nature.

Recent cases considering challenges to similar restrictions on indoor dining do not compel a contrary conclusion.  Indeed, every federal court to consider this question has found the relevant EOs and EEOs legislative in nature.  *See, e.g.*, *Our Wicked Lady LLC*, U.S. Dist. LEXIS 44505, at *5 (finding that the challenged EOS, including an order limiting indoor dining capacity to 25% were legislative in nature because they applied prospectively to all restaurants and fitness centers in New York City); *Hopkins Hawley*, 518 F. Supp. 3d at 714 (finding that "the Dining Policy" was legislative in nature because it applied generally and prospectively to all restaurants); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 784 (W.D.N.Y. 2020) (finding that the EOs were legislative because they "appl[ied] generally" and did "not adjudicate facts in individual cases").

Because the EOs were clearly legislative in nature, Plaintiffs had no right to notice or a hearing and thus fail to plausibly allege a procedural due process violation.

### b. Fourteenth Amendment Substantive Due Process

Plaintiffs claim that Defendants deprived them of their right to pursue their livelihood.  Compl. ¶ 80; *see also* Opp. at 3 (describing the interest as the right to work "at all").

The Due Process Clause of the Fourteenth Amendment "protects against certain government actions regardless of the fairness of the procedures used to implement them."

*Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 217 (2d Cir. 2012) (citation omitted).  The protections only attach to: (i) conduct that "shocks the conscience," and (ii) conduct that violates a fundamental right—a right implicit in the concept of ordered liberty.  *United States v. Salerno*, 481 U.S. 739, 746 (1987) (cleaned up); *Hopkins Hawley LLC*, 518 F. Supp. 3d at 715.  Plaintiffs argue that their claims are viable under either theory.  I disagree and hold that they fail to plausibly allege a substantive due process violation.

Under the first theory, Plaintiffs argue that the COVID-related dining restrictions shock the conscience because they took away Plaintiffs' "right to earn a livelihood."  Opp. at 5. They offer no authority in support of this bold proposition but merely assert that "[t]aking anyone's right to earn a living, to the point where it leads to the shutdown of their income stream and thus blocking them from enjoying rights implicit in the concept of ordered liberty, is a blatant shock of the conscience."  *Id.*  This theory fails for two reasons.

First, Plaintiffs fail to plausibly allege *conduct* that shocks the conscience.  The EOs and EEOs are not the type of "arbitrary action" or "egregious official conduct" "intended to injure in some way unjustifiable by any government interest."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998).  At best, Plaintiffs argue against policies that they consider ill-advised—*i.e.*, allowing certain businesses to operate unrestricted—but they have identified no conduct so egregious that it shocks the conscience.  *See Hopkins Hawley LLC*, 518 F. Supp. 3d at 715 (finding that even restrictions lacking scientific support do not satisfy the high bar of the shock the conscience standard); *see also Maniscalco v. New York City Dep't of Educ.*, 2021 U.S. Dist. LEXIS 184971, at *3 (finding that mandate requiring educators to take FDA-approved vaccine does not shock the conscience).

Second, even assuming that a deprivation of the right to earn a livelihood shocks the conscience, Plaintiffs' claims would still fail because they do not, in fact, allege such a deprivation. The Complaint concedes that the EOs and EEOs restricted only indoor dining and allowed restaurants to offer delivery and take-out services. That Plaintiffs chose not to offer such services, even where their failure to do so forced them to shut down operations altogether, does not alter the analysis. While the EOs and EEOs may have rendered operating less profitable, this alone is insufficient to plausibly allege a substantive due process violation. *See JWJ Indus., Inc. v. Oswego Cty.*, 538 Fed. App's 11, 14 (2d Cir. 2013).

Under the second theory, Plaintiffs argue—again without relevant citation—that the right to earn a livelihood is a fundamental right. Opp. at 4. A right is fundamental if it is "implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Bryant*, 692 F.3d at 217 (cleaned up). If the infringed right is fundamental, the regulation is subject to strict scrutiny, and "must be narrowly tailored to serve a compelling government interest." *Id.* If the regulation does not infringe a fundamental right, the government action "need only be reasonably related to a legitimate state objective." *Id.* (quotation marks omitted); *see also Grand River Enterprises Six Nations, Ltd. v. Boughton,* 988 F.3d 114, 121 (2d Cir. 2021) (substantive due process is not offended when government action is "rationally related to a legitimate state interest.").

Although courts have recognized that the due process clause "includes some generalized due process right to choose one's field of private employment," that right "is nevertheless subject to reasonable government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999); *see also New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 107 (1978) (citation omitted) ("Certain kinds of business may be prohibited; and the right to

conduct a business, or to pursue a calling, may be conditioned . . . .").  To state a claim as

Plaintiffs here seek to do, they must allege "a complete prohibition of the right to engage in a

calling . . . ."  *Conn*, 526 U.S. at 292.  "[B]usiness losses alone do not implicate the Due Process

right of occupational choice."  *Hu v. City of N.Y.*, 927 F.3d 81, 102 (2d Cir. 2019).

   Plaintiffs do not allege "a complete prohibition."  As noted above, the Complaint

concedes that the EOs and EEOs allowed Plaintiffs to continue operating and prohibited only

indoor dining.  *See, e.g.*, Compl. ¶ 47 (alleging that as a result of the EOs, Plaintiffs were "forced

to either close their restaurants or limit their business to take-out and delivery . . . ").  Courts

have repeatedly found that these and similar restrictions do not amount to a complete prohibition,

nor do they infringe a fundamental right.  *See, e.g.*, *Heidel*, 2021 U.S. Dist. LEXIS 203572, at

*30; *Our Wicked Lady LLC v. Cuomo*, 2021 U.S. Dist LEXIS 44505, at *4 (S.D.N.Y. Mar. 9,

2021); *Columbus Ale House*, 495 F. Supp. 3d at 94.

   Plaintiffs also do not plausibly allege that the EOs and EEOs were unreasonable.

To survive constitutional muster, the restrictions "need only be reasonably related to a legitimate

state objective."  *Bryant*, 692 F.3d at 217.  Courts considering these and similar orders have

repeatedly found that they are reasonably related to the governmental interest in containing the

spread of COVID.  *See, e.g.*, *Columbia Ale House*, 495 F. Supp. 3d at 93 (noting the real and

substantial relationship between governmental restrictions on indoor dining and the public health

goal of containing the virus).

   Plaintiffs argue that the EOs and EEOs lacked a legitimate or rational purpose

because "certain businesses were allowed to operate unrestricted."  But this alone does not

establish a lack of a real and substantial relationship to the state interest in containing the virus.

Moreover, Plaintiffs do not sufficiently address the basis for the distinction they seek to draw.

The businesses that were allowed to operate unrestricted (to the extent that this is factually accurate) do not pose the type of transmission threat that indoor dining does because individuals can remain masked and socially distanced while patronizing such establishments.  By necessity, eating indoors at a restaurant requires that customers be unmasked and within close proximity, increasing the likelihood of transmission.  I find it wholly rational for the government to place special or different restrictions on indoor dining because of the unique threat posed.  *See Our Wicked Lady LLC*, U.S. Dist. 44505, at *4 (finding it "rational for the government to limit the number of individuals in close contact in enclosed spaces to avoid the spread of the virus").  To the extent that Defendants erred by excluding other businesses does not establish that they violated Plaintiffs' constitutional rights, nor does it render the restrictions "arbitrary."  *Columbia Ale House*, 495 F. Supp. 3d at 93 ("In this pandemic, regulating to protect public health is fraught with medical and scientific uncertainty," leaving room for reasonable policy disagreements about the efficacy of official actions).

### c. Fourteenth Amendment Equal Protection

Plaintiffs claim that they were denied "[t]he right to be treated as other similarly situated businesses."  Compl. ¶ 81; Opp. at 5–6 (referring to the right to be treated similarly as other indoor establishments).

The Equal Protection Clause of the Fourteenth Amendment "embodies a general rule that States must treat like cases alike, but may treat unlike cases accordingly."  *Heidel*, 2021 U.S. Dist. LEXIS 203572, at *6 (quoting *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018)).  "If a law neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the legislative classification so long as it bears a rational relation to some legitimate end."  *Id.*  To bring an equal protection claim, where as here, Plaintiffs do not claim to be a member of

a protected class, they must make a threshold showing that they were treated differently from similarly situated comparators. *Airday v. City of New York*, 131 F. Supp. 3d 174, 184 (S.D.N.Y. 2015). That is, they must "allege the existence of similarly situated comparators" who received more favorable treatment. *Viteritti v. Inc. Vill. of Bayville*, 918 F. Supp. 2d 126, 135 (E.D.N.Y. 2013). Plaintiffs advance two classes of comparators, neither of which are similarly situated. Their failure to make the required threshold showing is fatal to their claims.

Plaintiffs allege that "gyms, personal care services, grocery and liquor stores, food banks and convenience stores" as well as "construction, museums, art galleries, movie theaters, casinos, [and] bowling alleys" are similarly situated comparators for the purposes of COVID-19 transmission because they are all indoor establishments. *Id.* ¶¶ 49–51, 108. The case law disagrees. First, courts have repeatedly observed that indoor dining poses a unique and greater risk to virus transmission because diners cannot wear masks while eating. *See, e.g.*, *Columbus Ale House*, 495 F. Supp. 3d at 93; *Hopkins Hawley*, 518 F. Supp. 2d at 708. Courts have also observed the additional risk posed by indoor dining because it "necessarily brings individuals from different households together in a restaurant, even if at a distance." *Columbus Ale House*, 495 F. Supp. 3d at 93. Finally, I would note that in addition to the obvious and most important distinctions based upon the requirement that patrons be unmasked to eat, the patronage patterns associated with a number of Plaintiffs' alleged comparators are markedly different. Patrons do not linger in the same way as restaurant diners do when they go to convenience stores or art museums or even gyms. Patrons are either in-and-out, as quickly as feasible, or, at the very least, they do not sit idle. In short, Plaintiffs' efforts to shoehorn themselves into a class of "indoor establishments" disregards the unique risks of transmission posed by an activity that requires

customers to be unmasked and brings together people from different households, both for an extended period of time.

Plaintiffs also allege that as "New York city restaurants," Plaintiffs were treated less favorably than "restaurants in the rest of New York State" during the reopening process. Compl. ¶ 66 (alleging that Plaintiffs were restricted to 50 percent capacity, whereas restaurants in other parts of the State were allowed to operate at 75 percent capacity). In their opposition, Plaintiffs argue that Defendant Cuomo's references to higher spread in higher populated areas improperly focuses on geography. Opp. at 6. In Plaintiffs' telling, once inside a restaurant, all are identically situated as to COVID risk. *Id.* Moreover, they argue that Defendants lacked a rational basis for the unequal treatment because Plaintiffs took all precautions to eliminate spread in their establishments.

Once again, Plaintiffs miss the point. To begin, history and the recent rise and rapid spread of the omicron variant vitiate Plaintiffs' contention that it would even be possible to "eliminate" spread, notwithstanding their best efforts. More to the point, New York City and all its businesses operate in a distinct and unique setting. New York City's "population density . . . makes it more likely that an outbreak linked to indoor dining will spread throughout the community at large." *Columbus Ale House*, 495 F. Supp. 3d at 93. So unique is New York City that state courts have found New York City restaurant and bar owners are not similarly situated to those in Westchester or even Long Island. *See Bocelli Ristorante Inc. v. Cuomo*, 139 N.Y.S.3d 481, 488–89 (N.Y. Sup. Ct. Richmond C'ty 2020).

Even assuming Plaintiffs have identified similarly situated comparators, their claims still fail because Plaintiffs have not met their burden of negating "every conceivable basis which might support" the challenged classification. *Our Wicked Lady*, 2021 U.S. Dist. LEXIS

44505, at *6.  The orders "bear a rational relationship to the goal of preventing the spread of

COVID-19."  *Id.*  Plaintiffs' allegations about the purportedly irrational and arbitrary character

of the restrictions are legal conclusions, unsupported by factual allegations, and therefore do not

plausibly state an equal protection claim.  *See Heidel*, 2021 U.S. Dist. LEXIS 205372, at *37.

d. Fifth Amendment Takings Clause

Plaintiffs argue that they suffered a taking because the EOs and EEOs "made

indoor dining illegal," and "effectively denied all profitable use to the property as configured."

Opp. at 7; Compl. ¶ 123 (alleging that four of the twelve plaintiffs were "forced" to close their

businesses).

When the government takes possession of property, or an interest in property, for

a public purpose, it has "a categorical duty to compensate the former owner."  *Tahoe-Sierra*

*Pres. Council v. Tahoe Reg'l Planning Agy.*, 535 U.S. 302, 322 (2002).  Takings may be physical

or regulatory—that is, the government may physically occupy or take possession of property,

*see, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), or the

government may pass regulations that interfere with property owners' beneficial use of their

property.  *See, e.g.*, *Penn Central Transp. Co. v. New York City*, 484 U.S. 104 (1978).

Regulatory takings are further divided into "categorical" and "non-categorical" takings.

*Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014).  Plaintiffs claim to have suffered

both types of regulatory takings.  I disagree and hold that Plaintiffs fail to plausibly allege a

taking of any type.

Plaintiffs do not plausibly allege a categorical taking because they do not allege

that their property was taken for a public use, or used in any way by the government.  A

categorial taking occurs when "a regulation . . . denies all economically beneficial or productive

use of land." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1937 (2017); *cf. Kelo v. City of New London*,

545 U.S. 469 (2005) (government transferred property ownership from one private party to

another); *Loretto*, 458 U.S. at 419 (government appropriated a part of a rooftop in order to

provide cable TV access for apartment tenants).  Plaintiffs also do not plausibly allege that they

were deprived of virtually all economic value because, as the Complaint admits, the EOs allowed

Plaintiffs to offer take-out and delivery services.  *Cf. Palazzolo v. Rhode Island*, 533 U.S. 606

(2001) (no regulatory taking by wetlands regulation because the owner could still construct a

residence on the land).  Although "[t]akeout, delivery and outdoor dining, alone or in

combination, were likely less profitable than indoor dining, they certainly allowed for productive

and economically beneficial use of plaintiffs' interest in their businesses."  *Heidel*, 2021 U.S.

Dist. LEXIS 203572, at *24–25 (citing *Tahoe-Sierra*, 535 U.S. at 331–32).  Moreover, the fact

that four Plaintiffs *did* close their doors is irrelevant because the Plaintiffs were not "*required* to .

. . close[] under the Executive Orders."  *Bimber's*, 496 F. Supp. 3d at 784; *see also McCarthy v.

Cuomo*, No. 20-CV-2124, 2020 WL 3286530, at *5 (E.D.N.Y. June 18, 2020) ("The COVID-19

Executive Orders plainly do not deny [plaintiff] all economically beneficial use of his property.

He could, for example, offer food and drinks . . . for take-out or delivery.").

Plaintiffs also allege that they suffered a non-categorical regulatory taking

because the EOs and EEOs interfered with their "reasonable investment backed expectations"

and had "substantial economic impact."  Opp. at 7.  A non-categorical taking may result from

"[a]nything less than a complete elimination of value, or a total loss."  *Tahoe-Sierra*, 535 U.S. at

330.  To determine whether a non-categorical regulatory taking has occurred, requiring

compensation, courts assess: (i) the economic impact of the regulation on the owner; (ii) the

extent to which the regulation interferes with distinct investment-backed expectations; and (iii)

the character of the governmental action, including whether the action promoted "the health, safety, morals, or general welfare of the public" or amounted to a "physical invasion" of property. *Penn Central Transp. Co.*, 484 U.S. at 124-28; *accord. Murr*, 137 S. Ct. at 137; *Our Wicked Lady LLC v. Cuomo*, 2021 U.S. Dist. LEXIS 44505, at *6 (S.D.N.Y. Mar. 9, 2021). Courts are wont to find a taking when the restrictions are "temporary," "prospective in application," and consist of "negative restriction[s] rather than . . . affirmative exploitation[s] by the state." *Buffalo Teachers*, 464 F.3d at 375.

Both case law and common-sense render Plaintiffs' claims for a non-categorical regulatory taking implausible. Indeed, none of the *Penn Central* factors weigh in favor of finding a taking. First, courts evaluating challenges to restrictions on indoor dining have stressed—and the Complaint here concedes, *see, e.g.*, Compl. ¶¶ 62, 66—the restrictions were temporary and could only be prospective in nature. *See Bimber's*, 496 F. Supp. 3d at 784; *Our Wicked Lady*, U.S. Dist. LEXIS 44505, at *6. While the restrictions undoubtedly had a negative economic impact on Plaintiffs' businesses, Plaintiffs admittedly were not denied all economic use of their property. *See Buffalo Teachers Fed'n*, 464 F.3d at 375 (finding temporary and partial nature of wage freeze weighed against finding a taking); *Kabrovski v. City of Rochester, N.Y.*, 149 F. Supp. 3d 413, 425 (W.D.N.Y. 2015) ("[I]t is well settled that a 'taking does not occur merely because a property owner is prevented from making the most financially beneficial use of a property.") (citation omitted). Thus, the temporary and prospective nature of the restrictions weighs against finding a taking.

As to the second factor, Plaintiffs allege that the EOs and EEOs interfered with their reasonable investment-backed expectations because "they all opened restaurants before March 2020, and they did so in reliance on a state of affairs that did not include Defendant[']s

regulatory regime[,]" and "operation of their businesses . . . was not conditioned on compliance with this heavy state regulation."  Compl. ¶ 124.  Given that Plaintiffs, as dining establishment operators, are ordinarily subject to a panoply of health-related regulations, however, I find it implausible that the institution of new regulations would come as a surprise, or that such changes would so substantially interfere with any expectations they may have had, as to require compensation.  This is especially so, given that Plaintiffs were permitted to continue operating.  Thus, the second factor also weighs against finding a taking.

Finally, and most importantly, as to the third factor, the restrictions at issue were purely negative and involved no physical invasion or appropriation of Plaintiffs' property.  *See Buffalo Teachers Fed'n*, 464 F.3d at 375; *Bimber's*, 496 F. Supp. 3d at 784 (finding that restrictions on indoor dining were "a negative restriction" weighing against a taking); *Our Wicked Lady*, U.S. Dist. LEXIS 44505, at *6 (same).  Courts have also repeatedly recognized that a public program that "adjusts the benefits and burdens of economic life to promote the common good" is uncharacteristic of a regulatory taking.  *Id.* at *6; *accord. Bimber's*, 496 F. Supp. 3d at 784 (finding that the restrictions on indoor dining were "a temporary exercise of the police power to protect the health and safety of the community, which weighs against a taking").  As Judge Cote so aptly stated in *Our Wicked Lady*, "[a]ctions like those taken through these orders, which are undertaken to address a global pandemic, do not constitute a regulatory taking."  *Our Wicked Lady*, U.S. Dist. LEXIS 44505, at *6.  Thus, the third factor also weighs against finding a taking.

Because all three factors weigh against finding a taking, Plaintiffs fail to meet their "heavy burden" to plausibly allege a regulatory taking, and Defendants are entitled to

dismissal of these claims.  *Our Wicked Lady LLC*, 2021 U.S. Dist. LEXIS 44505, at *6 (quoting

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006)).

          e. Contracts Clause

          Plaintiffs argue that the EOs and EEOs "impair[ed their] contractual

relationships" with their "landlords, vendors, creditors, workers, and employees to the point of

frustrating the purpose of . . . even entering into these contracts."  Opp. at 8.  I disagree.

          To determine whether a law or government action violates the Contracts Clause,

courts consider "the extent to which the law undermines the contractual bargain, interferes with a

party's reasonable expectations, and prevents the party from safeguarding or reinstating his

rights."  *Melendez v. City of New York*, No. 20-CV-4238, 2021 U.S. App. LEXIS 32327, at *49

(quoting *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018)).  The Second Circuit treats the

aggrieved party's reasonable expectations as the touchstone of the analysis: "Impairment is

greatest where the challenged government legislation was wholly unexpected."  *Elmsford Apt.*

*Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 169 (S.D.N.Y. 2020) (quoting *Sanitation &*

*Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997)).  For those who do

business in a heavily regulated industry, however, "the expected costs of foreseeable future

regulation are already presumed to be priced into the contracts formed under the prior

regulation."  *Id.* (quoting *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 55 (D. Conn.

2013), *aff'd*, 610 F. App'x 10 (2d Cir. 2015)).

          Plaintiffs were not prohibited from operating or from generating income from

takeout or delivery sales, and thus their ability to meet their contractual obligations was not

substantially impaired.  *Cf. Melendez*, No. 20-CV-4238, at *79 (holding that New York's

Guaranty Law substantially impaired landlords' contractual rights because the law rendered any

contractual obligations unenforceable for approximately sixteen months and prohibited the landlords from ever recovering lost rents).  Further, as noted above, Plaintiffs operate in a heavily-regulated industry and are ordinarily subject to a panoply of health-related regulations. It is therefore, again, implausible that they could not reasonably foresee that future health-related regulations might alter the terms upon which they could operate.  Finally, because the EOs allowed Plaintiffs to continue operating, they were not prevented from safeguarding their rights. That said, even assuming that Plaintiffs' contractual rights had been *temporarily* impaired, as later EOs and EEOs began rolling back restrictions on indoor dining, Plaintiffs were not prevented from reinstating their rights.

Because Plaintiffs do not plausibly allege a violation of their rights under the Contracts Clause, Defendants are entitled to dismissal of these claims.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are granted.  The argument currently scheduled for February 15, 2022 is canceled.  The Clerk shall terminate the motions (ECF Nos. 39, 49) and grant judgment in Defendants' favor, dismissing the case against them.

SO ORDERED.

Dated:    February 7, 2022                      /s/ Alvin K. Hellerstein
          New York, New York            ALVIN K. HELLERSTEIN
                                        United States District Judge